USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/25/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK VAUGHN,

                      Plaintiff,

                  v.

PHOENIX HOUSE PROGRAMS OF NEW
YORK, ARTHUR WALLACE, BRENDAN
L. HOFFMAN, THOMAS JASPER, and
DENISE BUCKLEY,

                    Defendants.

No. 14-CV-3918 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

*Pro se* Plaintiff Mark Vaughn brings this action under the Fair Labor Standards Act ("FLSA"), 42 U.S.C. § 1983, and provisions of New York State and City law for claims relating to work he performed while receiving in-patient substance abuse treatment at Phoenix Houses of New York, Inc. ("Phoenix House") as part of an alternatives to incarceration program.[1]  In his Amended Complaint, Plaintiff claims that those work assignments violated his constitutional rights and deprived him of fair pay to which he was entitled under federal and state law.  Defendants Phoenix House and Phoenix House employees Denise Buckley, Arthur Wallace, Thomas Jasper, and Brendan Hoffman move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the motion is granted.

---

[1] Phoenix House is improperly named in the Amended Complaint as "Phoenix House Programs of New York."  The Clerk of the Court is respectfully directed to change the caption to "Phoenix Houses of New York, Inc."

## BACKGROUND

**I.    Facts[2]**

On July 29, 2009, as part of two alternatives to incarceration programs—T.A.S.C. and D.T.A.P.—Plaintiff agreed to participate in an in-patient drug treatment program in lieu of a prison sentence. Am. Compl. at 7.[3]  Pursuant to that agreement, he alleges he was "mandated" by the Kings County Supreme Court to Phoenix House for 18–24 months.  *Id.*  After completing the in-patient treatment, Plaintiff was also required to "work on the books" and attend six months of outpatient services, upon completion of which the charges against him would be dismissed.  *Id.*  If he violated the terms of the agreement, however, he "could be sentenced to the prison term agreed on by [him] and the court."  *Id.*[4]

Plaintiff arrived at Phoenix House in Long Island City ("L.I.C.") on July 28, 2009 to begin a 30-day orientation program.  *Id.*  At that time, Jose Rosario was the managing director of the program; not long after, he was replaced by Defendant Denise Buckley.  *Id.*

Plaintiff alleges that during orientation, residents of Phoenix House were required to work two eight-hour shifts on Saturday and Sunday.  *Id.* at 8.  Following orientation, the residents were

---

[2] The facts set forth herein are taken from Plaintiff's Amended Complaint and are presumed to be true for purposes of this motion to dismiss.

[3] On its website, the New York State Office of Alcoholism and Substance Abuse Services ("OASAS") identifies both programs as Alternatives to Incarceration programs used in the state.  TASC is described as a program licensed by OASAS to "to identify suitable offenders with substance abuse problems for diversion."  *See* "Treatment Accountability for Safer Communities ("TASC")," *available at* https://www.oasas.ny.gov/cj/alternatives/TASC.cfm. DTAP is described as a program initiated by the Queens County District Attorney in 1990 to divert "prison bound felony offenders to residential drug treatment."  *See* "Drug Treatment Alternatives to Prison "DTAP," *available at* https://www.oasas.ny.gov/cj/alternatives/DTAP.cfm.  "Qualified defendants enter a felony guilty plea and receive a deferred sentence that allows them to participate in a residential therapeutic community (TC) drug treatment program for a period of 18 to 24 months. Those who successfully complete the program have their charges dismissed; those who fail are brought back to court by a special warrant enforcement team and sentenced to prison."  *Id.*

[4] Plaintiff's allegations do not make clear whether he agreed to participate in the T.A.S.C./ D.T.A.P. programs in conjunction with pleading guilty to the charges against him, or prior to the disposition of those charges.  In any event, this issue is not dispositive of any of the claims discussed below.

2

required to work six eight-hour shifts a week. The residents were not paid for these shifts. According to Plaintiff, he "became concerned" when he learned he was required to work without pay and spoke to Phoenix House employee Ms. Cahill about it; she purportedly told him that work was part of the treatment program. *Id.* at 8. During a house meeting, Defendant Terrance Waring—the House Manager at the L.I.C. campus—informed Plaintiff that he was assigned to kitchen duty. Plaintiff refused the assignment, arguing that he was "not there as a laborer." *Id.* at 1, 8. After the meeting, Waring spoke to Plaintiff in his office and confirmed that he was at Phoenix House as part of the T.A.S.C. program. *Id.* at 8. Like Cahill, Waring purportedly told Plaintiff that the "job function" was a part of the treatment program and that he could not remain at Phoenix House if he refused to work. *Id.*

Plaintiff claims that because the alternative to the program was "going to jail, no ifs, ands, or buts about it," he initially agreed to perform his work duties and was subsequently assigned to work as the "basement point." *Id.* at 9. A "point person"—of which the basement point was one—was assigned a desk on a particular floor in the facility to relay information from the front desk to the residents on that floor; the point person also generally kept track of the comings and goings on the floor by recording such information in a "point sheet." *Id.* at 4. After approximately one month, Plaintiff's assignment was changed to the garbage room. *Id.* at 9. He worked in those two positions from about August 2009 until November 2009. *Id.*

Soon after starting his work duties, Plaintiff wrote a letter of complaint to the New York State Office of Alcohol and Substance Abuse Services regarding the work requirement at Phoenix House. The reply he received, however, allegedly told him, in sum and substance, to "do the job function." *Id.*

3

        In November 2009, Plaintiff was sent from the L.I.C. location to the 50 Jay Street location

of Phoenix House to attend a carpentry class.  *Id.*  Defendant William Brown was assigned as

Plaintiff's substance abuse counselor while at that location.  *Id.*  As his work duty, Plaintiff was

again assigned to work as basement point.  *Id.*  In December, Plaintiff began carpentry classes

from 9:00 a.m. to 2:30 p.m.  *Id.*[5]  By that time, Plaintiff was no longer working as basement point

but instead was "working various points throughout the building" from 3:00 p.m. to 11:00 p.m.

*Id.*

        In mid-January 2010, Plaintiff refused to continue working at the facility.  *Id.* at 9–10.  This

was reported to Brown, who told Plaintiff that he could decide to comply with the rules of the

treatment program or choose to "go to jail," but that it "made him no difference."  *Id.* at 10.  After

that conversation, Plaintiff worked at the point "for a few hours" but then abandoned the post; he

repeated this pattern for a few days.  *Id.*  The staff was allegedly "furious" with Plaintiff for leaving

the point unattended, which meant that they could not make contact with the other floors.  *Id.* at

10–11.  After Plaintiff was told that he would be discharged from the program if he abandoned his

post again, he began reporting for work during the week but refusing to work on the weekends.

*Id.* at 11.

        Consequently, Brown arranged an "intervention" with Henry Algarin from the Brooklyn

T.A.S.C. program.  *Id.*  Algarin purportedly told Plaintiff that he should "do what [he] needed to

do to finish the program and go home."  *Id.*  On February 3, 2010, Brown wrote a letter to the

judge regarding Plaintiff's non-compliance with his work assignments and the court directed

Plaintiff to "correct this problem."  *Id.*  As a result of these interventions, Plaintiff worked "all

---

        [5] Plaintiff alleges that he began carpentry classes in December 2010, but based on the respective timing of
other allegations in the Amended Complaint, it appears this is a typographical error and that the classes began in
December 2009.

4

points on all shifts" assigned to him from November 2009 to October 2010, when he finished the inpatient portion of the T.A.S.C./D.T.A.P. program. *Id.*

Upon his release from in-patient treatment, Plaintiff did not abide with the outpatient requirements of his agreement; he was therefore "mandated" back to Phoenix House in February 2011 for a minimum of six additional months. *Id.* Defendant Arthur Wallace was assigned as Plaintiff's substance abuse counselor during this stay. *Id.* at 12. After his 30 day orientation period, Plaintiff refused to complete his work duties despite another intervention by Algarin. *Id.* Wallace reported his refusal to the judge, who purportedly told Plaintiff that if he was kicked out of the program he would go to jail. *Id.* Plaintiff thus returned to work at various point assignments in the building from April 2011 to November 2012. *Id.*

Despite his eventual cooperation, Plaintiff wrote to the Department of Labor ("DOL") regarding his work assignments in the spring of 2011. On May 23, 2011, he received a response from the DOL informing him that it had no authority over his program. *Id.*

At the conclusion of the additional six-month residency, Plaintiff reported to the court and expected to be released. Because he had not complied with the "job function" at the facility, however, the court refused to release him. *Id.*

Plaintiff claims that his work duties at Phoenix House had no therapeutic value and merely provided unpaid labor for the facility that did not benefit Plaintiff or the other residents. *Id.* at 13. He also claims that those work duties prevented him from participating in treatment during work hours and that, as a result, he did not receive an adequate amount of therapeutic treatment while in the program. *Id.* at 13–14.[6]

---

[6] Plaintiff further alleges that during his time at Phoenix House, he was denied home visits and visits from family members because of his work refusals. Am. Compl. at 12. He also claims to have been prohibited from going on various trips and outings with the other residents for the same reason. *Id.*

5

## II.    Procedural History

Plaintiff filed this action on May 12, 2014, and filed an Amended Complaint on September 10, 2014. He asserts violations of the United States Constitution, the FLSA, the New York Labor Law, and other provisions of New York State and New York City law. *See* Dkt. 1, 5. After Defendants moved to dismiss the Amended Complaint on February 17, 2015, Plaintiff voluntarily dismissed his claims against Defendants Terrance Waring, Herman Lazada, and William Brown. Dkt. 49, 50. The Court now dismisses the remaining causes of actions against Defendants Phoenix House, Denise Buckley, Arthur Wallace, Thomas Jasper, and Brendan Hoffman for failure to state a claim.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where, as here, the complaint was filed *pro se*, it must be construed liberally to raise the strongest arguments it suggests." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)). In deciding a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), "the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Hogan*, 738 F.3d at 514 (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010)).

6

## DISCUSSION

Defendants argue that the Amended Complaint should be dismissed in its entirety because (1) Plaintiff's federal claims are untimely, (2) he fails to state a claim for relief under either § 1983 or the FLSA, (3) he fails to allege any personal involvement by Defendants Hoffman and Jasper in the conduct described, and (4) Defendant Hoffman was improperly served. Defendants further argue that because Plaintiff's federal claims must be dismissed, the Court should decline to exercise its supplemental jurisdiction over the remaining claims under state and city law.

The Court agrees that Plaintiff has failed to state a claim under federal law, which provides the basis for the Court's subject matter jurisdiction, 28 U.S.C. § 1331, and declines to exercise supplemental jurisdiction over Plaintiffs' claims under state and city law.

## I. Plaintiff's Federal Claims

Plaintiff asserts federal claims pursuant to 42 U.S.C. § 1983 and the FLSA. Neither has merit.

### A. Section 1983

According to Plaintiff, "Phoenix House required [him] to perform labor that [he] had a right not to be made to perform" and that it "used the court system[] to aid [it] in [its] illegal exploitation of [him] and [his] rights." Am. Compl. at 14. In so doing, Plaintiff contends that Defendants violated his rights under the Fifth, Thirteenth, and Fourteenth Amendments. Am. Compl. at 15. The Court construes these claims as arising under 42 U.S.C. § 1983.[7] Even liberally

---

[7] Although the Amended Complaint cites 42 U.S.C. § 1981, Am. Compl. at 15, the Second Circuit has not recognized an independent right of action under § 1981. *See Smith v. Metro. Dist. Comm'n*, 2015 WL 2337903, at *3 n.7 (D. Conn. May 13, 2015). In *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), the Supreme Court held that § 1983 constitutes the exclusive federal remedy for the violation of the rights guaranteed in § 1981 by state governmental units. Section 1981 has since been amended; however, all but one of the circuit courts to have subsequently addressed the issue continue to follow the rule established in *Jett. Compare Brown v. Sessoms*, 774 F.3d 1016, 1021 (D.C. Cir. 2014); *Campbell v. Forest Preserve Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014); *McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009); *Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008); *Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1137 (10th Cir. 2006); *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 464 (5th

construing Plaintiff's allegations, as the Court must, he nonetheless fails to plausibly allege a constitutional claim for relief.

### 1. State Action Requirement

As an initial matter, Plaintiff's constitutional claims fail as a matter of law because neither Phoenix House nor the individual Defendants are state actors, nor were they acting under color of law. 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law." The statute does not, however, provide a remedy with respect to "merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999) (quotations and citations omitted). To show state action, Plaintiff must establish both that his "'alleged constitutional deprivation [was] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that the party charged with the deprivation [is] a person who may fairly be said to be a state actor.'" *Grogan v. Blooming Grove Volunteer Ambulance Corps.*, 768 F.3d 259, 263–64 (2d Cir. 2014) *cert. denied*, 135 S. Ct. 1895 (2015) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 111 (2d Cir. 2003)).

Although Plaintiff alleges that he was required to participate in Phoenix House's inpatient treatment program as an alternative to incarceration and that Phoenix House "used the Court system[] to aid [it] in [its] illegal exploitation," he has not plausibly alleged that Defendants are

---

Cir. 2001); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995), *with Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1212 (9th Cir. 1996). This Court adopts the majority view in concluding that § 1983 provides Plaintiff's exclusive federal remedy.

state actors.  There is no dispute that Phoenix House is a private entity.  The Second Circuit has

held that the actions of such entities are only "attributable to the state" when they meet one of three

tests:

> 1. The compulsion test: the entity acts pursuant to the coercive power of the state
> or is controlled by the state, 2. The public function test: the entity has been
> delegated a public function by the state, or, 3. The joint action test or close nexus
> test: the state provides significant encouragement to the entity, the entity is a willful
> participant in joint activity with the state, or the entity's functions are entwined with
> state policies.

*Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (quotations and alterations

omitted).  None of these tests is applicable here.  There is no allegation that the state controlled or

ran Phoenix House or that the state delegated a public function to it.  Nor is there any allegation

suggesting any "joint activity" between Phoenix House and the court or that Phoenix House's

functions were "entwined" with state policies.

It is true that Plaintiff received treatment at Phoenix House as part of his T.A.S.C./ D.T.A.P.

agreement with the court, but he acknowledges that he voluntarily agreed to participate in the

program in order to avoid a prison sentence.  *See* Am. Compl. at 7, 9.[8]  Phoenix House did not,

moreover, act at the direction of the state or pursuant to its coercive power with regard to Plaintiff's

treatment.  To be sure, the court required Plaintiff to complete the inpatient program and comply

with its requirements, but he does not allege that any of the specific conditions of his treatment at

Phoenix House, including his work assignments, were ordered or overseen by the court.

---

[8] Even if Plaintiff was involuntarily sent to Phoenix House, however, such a requirement of the court—without more—is insufficient to establish state action on Phoenix House's part. *See Byng v. Delta Recovery Servs.*, 2013 WL 3897485, at *8 (N.D.N.Y. July 29, 2013), *aff'd*, 568 F. App'x 65 (2d Cir. 2014) (holding that even if the plaintiff was "forced to reside" at a substance abuse treatment center as a condition of parole, that fact was insufficient deem the facility a state actor for purposes of § 1983).

Plaintiff has also not plausibly alleged that Phoenix House was engaged in a public function. "Under the public function test, 'the exercise by a private entity of powers traditionally exclusively reserved to the [s]tate' can constitute 'state action.'" *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 259 (2d Cir. 2008) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). Although Plaintiff went to Phoenix House to fulfill his court-ordered obligations, at all times Phoenix House and its employees were exclusively engaged in providing substance abuse rehabilitation to the residents—a power not exclusively reserved to the state. *See id.* Furthermore, Phoenix House was not involved in any aspects of Plaintiff's criminal proceeding. Indeed, Plaintiff's allegations make clear that Phoenix House had no control or authority over Plaintiff's court case; it was the judge assigned to his case, and not Defendants, who determined whether he was in compliance with his T.A.S.C./D.T.A.P. agreement. *See* Am. Compl. at 7, 11, 12; Pl. Opp. (Dkt. 40) at 19. *See also Smith v. Devline*, 239 F. App'x 735, 736 (3d Cir. 2007) (finding no state action where private company providing treatment services in connection with re-entry had no authority to return resident to prison if he violated the conditions of the program).

That Plaintiff opted to participate in the program at Phoenix House in lieu of completing a prison sentence does not does not transform the treatment facility and its employees into state actors, nor does it render their actions in implementing the internal requirements of the treatment program—which were not created or directed by the court—into state action. *See Velez v. SES Operating Corp.*, No. 07-CV-10946 (GEL), 2008 WL 2662808, at *2 (S.D.N.Y. July 3, 2008) ("[T]he fact that defendants operate a 'drug and alcohol rehabilitation facility treating many parties who as a condition of their parole and/or criminal guilty plea undergo some drug and alcohol treatment' is [not] suggestive of state action."); *Mele v. Hill Health Ctr.*, 609 F. Supp. 2d 248, 258–

59 (D. Conn. 2009) (finding no state action by defendants who administered a drug intervention program even though the state permitted criminal defendants to complete such program in lieu of prosecution or serving a sentence). *But see Johnson v. White*, No. 06-CV-2540 (LAP), 2010 WL 3958842, at *4 n.5 (S.D.N.Y. Sept. 9, 2010); *Wilson v. Phoenix House*, No. 10-CV-7364 (DLC), 2011 WL 3273179, at *3 (S.D.N.Y. Aug. 1, 2011).[9] Here, although Plaintiff's allegations establish some nexus between his treatment at Phoenix House and his agreement with the Court, they also make clear that Phoenix House's sole function was to provide drug treatment and that the terms of that treatment were not directed, monitored, or significantly encouraged by the Court. Thus, the nexus is not sufficiently close to establish state action necessary for § 1983 liability.

## 2. Alleged Constitutional Violations

In any event, even if the state action requirement were satisfied, Plaintiff's § 1983 claims fail because the facts alleged do not establish a constitutional violation under the Thirteenth, Fourteenth, or Fifth Amendments.

### a. Thirteenth Amendment

The Thirteenth Amendment prohibits slavery and involuntary servitude. U.S. Cont. amends. 13. The Supreme Court has observed that "involuntary servitude" as contemplated by the

---

[9] These cases are distinguishable. In *Wilson v. Phoenix House*, the district court found the state action requirement to be satisfied because the plaintiff alleged she was "confined" to Phoenix House to serve her sentence and Phoenix House exercised a public function by "discharging [plaintiff] to the court" after asking the district attorney to transfer her to another facility. 2011 WL 3273179, at *1. That discharge was the subject of the plaintiff's § 1983 claim. By contrast, Vaughn's allegations here concern the treatment—or alleged lack thereof—he received at Phoenix House. Unlike in *Wilson*, there is no allegation that he was "confined" there; rather, he was told that he could leave if he chose not to comply with the program's requirements. *See* Am. Compl. 8–9. Moreover, Vaughn alleges that it was the court, not Phoenix House, that determined whether he was in compliance with his "agreement" with the court. *See id.* 10–12.

In *Johnson v. White*, the district court suggested in dicta that the relationship between the state and a treatment center may be sufficient to establish that the facility was delegated a public function where the plaintiff was "required to undergo inpatient treatment at [the defendant facility] as an outgrowth of his sentence, and . . . [the facility] accepted him on those terms." 2010 WL 3958842, at *4 n.5 (S.D.N.Y. Sept. 9, 2010). In that case, however, whether defendant was a state actor was not at issue; as a result, the court did not engage in a fact-specific analysis of the relationship between the court and the facility in question. *See id.*

11

Thirteenth Amendment "was intended 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.'" *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 459 (2d Cir. 1996) (quoting *United States v. Kozminski*, 487 U.S. 931, 942 (1988)). Although the Thirteenth Amendment "was intended to prohibit all forms of involuntary labor, not solely to abolish chattel slavery," *McGarry v. Pallito*, 687 F.3d 505, 510 (2d Cir. 2012), it does not, however, "bar labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are 'exceedingly bad.'" *Immediato*, 73 F.3d at 459 (citing *United States v. Shackney*, 333 F.2d 475, 485 (2d Cir. 1964)).

Plaintiff fails to state a Thirteenth Amendment claim, among other things, because he does not allege that his participation in the Phoenix House treatment program—including its work requirement—was involuntary.[10] In fact, Plaintiff concedes that he chose to participate in the treatment program to avoid jail time, and that, on numerous occasions during his time at Phoenix House, he refused to work. *See* Am. Compl. at 10, 12. Plaintiff also fails to allege that Defendants used any force, restraint, or other method of coercion to compel him to work; indeed, Vaughn asserts that when he refused to perform his assigned duties, his program supervisor told him that he could leave Phoenix House. *Id.* at 8–9. In sum, although Plaintiff participated in the T.A.S.C./ D.T.A.P. program to avoid potential prison time, his participation was nevertheless voluntary and not barred by the Thirteenth Amendment. *See Immediato*, 73 F.3d 454 at 459–61 (concluding that school's mandatory community service requirement did not constitute impermissible involuntary servitude).

---

[10] To the extent that Plaintiff pled guilty as part of his T.A.S.C./D.T.A.P. agreement prior to his inpatient treatment at Phoenix House, he is barred as a matter of law from asserting a Thirteenth Amendment Claim. U.S. Const. amend. XIII (amendment does not apply to "punishment for crime whereof the party shall have been duly convicted").

12

### b. Fifth and Fourteenth Amendment Due Process

Plaintiff's allegations further fail to establish a due process violation under the Fifth or Fourteenth Amendment. As an initial matter, only the Fourteenth Amendment applies to Plaintiff's due process claim against Defendants, as they are not alleged to be federal government entities or employees. *See Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466–67 (S.D.N.Y. 2009). In any event, Plaintiff cannot establish a due process violation under the Fourteenth Amendment because he has not plausibly alleged that he was deprived of a protected liberty or property interest. *Am. Mfrs.*, 526 U.S. at 59 ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'").

Plaintiff's liberty interests were not impeded because, as discussed above, he was free to decline to participate in the T.A.S.C./ D.T.A.P. program, or to leave Phoenix House at any point. Plaintiff has also not plausibly alleged the deprivation of any protected property interest. To the extent he is alleging that he has a constitutional right to drug treatment, or to a specific type of drug treatment, there is no legal authority for such a claim. *See Smith v. Follette*, 445 F.2d 955, 961 (2d Cir. 1971) (no right to drug treatment for drug-related crimes); *Doe v. Goord*, No. 04-CV-0570 (GBD)(AJP), 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005) (same); *Bailey v. Corbett*, 2013 WL 4737312, at *4 (D. Conn. Sept. 3, 2013) (same); *Mele*, 609 F. Supp. 2d at 259 (same). As a result, Plaintiff fails to state a claim under either the Fifth or Fourteenth Amendment.

### B. FLSA

Plaintiff similarly fails to state a claim for relief under the FLSA. The FLSA requires the payment of minimum and overtime wages to anyone who qualifies as an "employee" within the meaning of the statute. *See* 29 U.S.C. § 203(e). Because Plaintiff does not qualify as a covered employee, however, he was not entitled to be paid for his work assignments at Phoenix House.

In the Second Circuit, "employment for FLSA purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Barfield v. NYC Health & Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008) (citation omitted). Thus, "the determination of whether an employer-employee relationship exists for purposes of the FLSA" is governed by an "'economic reality' test." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) *cert. denied*, 134 S. Ct. 1516 (2014). The pertinent "economic realities" do not consist of a set of "uniform factors," but rather, are "assessed by reference to the particular situation with some factors more important than others depending on the FLSA question at issue and the context in which it arises." *Brown v. New York City Dep't of Educ.*, 755 F.3d 154, 167 (2d Cir. 2014) (quotations omitted).

Another court in this district recently considered a scenario similar to that presented in this case, namely, whether someone who performs community service work as a condition of an adjournment in contemplation of dismissal ("ACD") of criminal charges qualifies as an employee within the meaning of the FLSA. *Doyle v. City of New York*, __ F. Supp. 3d. __, 2015 WL 926001 (JMF) (S.D.N.Y. Mar. 4, 2015). Looking to "our common linguistic intuitions" as the "best guide" to determine if plaintiffs there were employees, Judge Furman concluded that they were not, as they did not perform their community service "for the purpose of enabling them to earn a living" or "to receive financial compensation of any kind." *Id.* at *6. Instead, the purpose of the ACD program was "to enable the parties to resolve cases involving minor offenses in a way that provides more substantial consequences than outright dismissal of the charges, but allows defendants to avoid the risks and anxieties associated with further prosecution and the 'criminal stigma' that attaches to convictions." *Id.* (citing *Lancaster v. Kindor*, 471 N.Y.S.2d 573, 579 (App. Div. 1st Dep't 1984)). As the *Doyle* Court observed, a contrary conclusion that the FLSA applied to

14

persons agreeing to pursue these types of programs would threaten the objective of the programs while failing to further Congress's purpose in enacting the FLSA, which was to "eliminate, as rapidly as practicable, substandard labor conditions throughout the nation." *Id.* (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509–10 (1950)).

The Court finds this analysis persuasive. Like the plaintiffs in *Doyle*, Vaughn did not agree to participate in the Phoenix House treatment program for the purpose of receiving monetary compensation; indeed nowhere in his Amended Complaint or opposition brief does he suggest that expected compensation played any role in his decision to enter the program. Rather, Plaintiff agreed to participate in the T.A.S.C./ D.T.A.P. program in order to resolve the criminal charges against him. *See* Am. Compl. at 7, 9. Furthermore, although Plaintiff contends that it was Phoenix House and not he who benefited from the work assignments, he acknowledges that had he successfully completed the program, the charges against him would have been dismissed without a prison sentence. *Id.* at 7. It thus appears that the "principal benefit" of Plaintiff's participation in the program was to him and his assertions to the contrary are implausible. *See Doyle*, 2015 WL 926001, at *7 (citing *Isaacson v. Penn Comm. Servs., Inc.*, 450 F.2d 1306, 1309–10 (4th Cir. 1971)).

Finally, the Second Circuit's holding in *Danneskjold v. Hausrath*, 82 F.3d 37, 39 (2d Cir. 1996), that "the FLSA does not apply to prison inmates in circumstances in which their labor provides services to the prison, whether or not the work is voluntary" provides further support for this Court's conclusion. While Vaughn, like the plaintiffs in *Doyle*, was not a prison inmate, as with the relationship between inmates and the prisons where they are incarcerated, the relationship between Plaintiff and Phoenix House was "not one of employment." *See id.* at 42. Rather, Plaintiff's work assignments were "designed to train and rehabilitate" and his "labor [did] not

15

compete with private employers." *See id.*; *See also Sanders v. Hayden*, 544 F.3d 812 (7th Cir. 2008) (holding that designated sex offenders working at treatment centers are not "employees" under FLSA); *Wingate v. New York City*, 2014 WL 3747641, at \*2 (E.D.N.Y. July 25, 2014) (concluding that FLSA did not apply to pretrial detainees).

Indeed, each of the work assignments described in the Amended Complaint are directly— and exclusively—related to the operation of Phoenix House. *See Danneskjold*, 82 F.3d at 43 (describing duties that serve institutional needs such as "cook[ing], staff[ing] the library, perform[ing] janitorial services, work[ing] in the laundry, or carry[ing] out numerous other tasks that serve various institutional missions of the prison, such as recreation, care and maintenance of the facility, or rehabilitation"). Plaintiff alleges, for instance, that he was assigned to serve as the point person at various locations in the facilities. He also describes working as an overnight coordinator at the front desk of the facility to communicate messages to the point persons on other floors, and working in the garbage room and warehouse. Am. Compl. at 5–7. Plaintiff thus did not "produce goods or services that [were] sold in commerce," but rather, merely provided services for the facility where he received treatment. *See Danneskjold*, 82 F.3d at 44; *Doyle*, 2015 WL 926001, at \*8.

For these reasons, Plaintiff does not qualify as a covered "employee" under the FLSA and his claim fails as a matter of law.

## II.    Supplemental Jurisdiction Over Plaintiff's Claims Under State and City Law

Pursuant to 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." To determine whether to exercise supplemental jurisdiction, district courts must balance the "values of judicial economy, convenience, fairness, and comity." *See also Carnegie-*

16

*Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7. Here, there are no unusual circumstances warranting the continued exercise of supplemental jurisdiction over Plaintiff's claims under state and city law. Accordingly, they too are dismissed.

**III.    Defendants' Remaining Arguments**

Having dismissed the entirety of the Amended Complaint, the Court need not reach Defendants' additional arguments regarding statute of limitations, the involvement of Defendants Hoffman and Jasper in the conduct alleged, and service.

**CONCLUSION**

For the reasons set forth above, the Amended Complaint is dismissed in its entirety. In light of the principles articulated herein, the Court is doubtful that any amendment to the Complaint would cure its deficiencies. In deference to Plaintiff's *pro se* status, however, the Court grants leave to amend to the extent he has a good faith basis for doing so. *See Neilsen*, 746 F.3d at 62 ("Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim.") (citation omitted). If he chooses to file a Second Amended Complaint, Plaintiff must do so within thirty days of this Opinion and Order or this dismissal shall become final.

The Clerk of the Court is respectfully directed to close item 30 on the docket.

SO ORDERED.

Dated:    September 25, 2015
          New York, New York

Ronnie Abrams
United States District Judge

17