USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 2/12/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK VAUGHN,

                Plaintiff,

-v-

PHOENIX HOUSE FOUNDATION, INC. and
PHOENIX HOUSES OF NEW YORK, INC.,

                Defendants.

No. 14-CV-3918 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Mark Vaughn brings this action against Defendants Phoenix House Foundation, Inc. and Phoenix Houses of New York, Inc. (collectively, "Phoenix House") for alleged violations of, *inter alia*, the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). This Court previously dismissed Vaughn's Amended Complaint and Second Amended Complaint for failure to state a claim. On appeal, the Second Circuit affirmed in part and vacated in part, remanding Vaughn's FLSA claims, as well as state and city law claims, for reconsideration in light of *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016). Before the Court is Phoenix House's motion to dismiss the Third Amended Complaint ("TAC"). For the reasons that follow, the motion to dismiss is granted.

## BACKGROUND

### I.    Factual Background[1]

In July of 2009, Vaughn agreed to participate in an in-patient substance abuse rehabilitation program "in lieu of facing criminal charges." TAC ¶¶ 1, 9. Vaughn had a history of substance

---

[1] These facts are taken from the TAC and are accepted as true for the purposes of this motion to dismiss.

abuse, which began when he was 12 years old, and he "hoped that his time at Phoenix House would provide him with the therapy he needed to lead a drug-free life and allow him to be a good parent to his young daughter." *Id.* at ¶ 22. Vaughn was placed in a treatment facility operated by Phoenix House, and he initially spent approximately 15 months in Phoenix House's in-patient program. *Id.* at ¶¶ 21, 40. Although he was released in October of 2010, he failed to abide by his outpatient stipulations and returned to one of Phoenix House's facilities in February of 2011. *Id.* at ¶ 40, 42. He remained in their in-patient program for 11 more months, until January of 2012. *Id.* at ¶ 49.

Vaughn alleges that, while he was a patient at Phoenix House's facilities, he was required to perform many hours of unpaid, menial work. *Id.* at ¶ 1. For example, Vaughn alleges that at times he was required to work as the "basement point," a job which required him to sit at a desk, relay information to patients, and generally to serve as the "point person" on the floor for eight-hour shifts, six days per week. *Id.* at ¶ 30. During another portion of his treatment, Vaughn was required to work in the garbage room, where he also worked six days a week in eight hour shifts. *Id.* at ¶ 32. Vaughn was also required to work at the warehouse, where he was responsible for, among other things, packing food orders for delivery to Phoenix House's treatment locations. *Id.* at ¶ 47. Vaughn alleges that this work exhausted him and left him with little time to participate in therapeutic sessions. *Id.* at ¶ 35. He also alleges that the work did not contribute to his treatment plan or advance his goals, which were "to obtain the skills he needed to stay off drugs and gain vocational skills that could translate into stable (i.e., not menial, low wage) employment." *Id.* at ¶ 52.

Vaughn complained to staff about his work requirements and at times failed to report to work. *Id.* at ¶¶ 36–40, 62. In response, the staff at Phoenix House's treatment facility told Vaughn that if he did not complete his work, he would be required to go to jail. *Id.* at ¶¶ 36–37. Phoenix

House also arranged an "intervention" around Vaughn's work issues and sought the involvement of a judge. *Id.* at ¶ 39. During Vaughn's second stay at the treatment facility, he expected to be released after approximately 6 months. However, due to his work issues, a judge required him to stay for several more months, until January 2012. *Id.* at ¶ 49.

## II. Procedural History

Vaughn initiated this action *pro se* on May 12, 2014 and on September 10, 2014, he filed an Amended Complaint, asserting causes of action under 42 U.S.C. § 1983, the FLSA, and various provisions of New York State and City law. On September 25, 2015, this Court granted Phoenix House's motion to dismiss the Amended Complaint, holding that the § 1983 claims lacked merit and that the FLSA claims failed because Vaughn was not an "employee" within the meaning of the FLSA. *Vaughn v. Phoenix House Programs of New York*, No. 14-cv-3918, 2015 WL 5671902, at *6–8 (S.D.N.Y. Sept. 25, 2015). In concluding that Vaughn did not have an employment relationship with Phoenix House, the Court considered (1) that Vaughn had not entered the program for the purpose of receiving monetary compensation, (2) that Vaughn, not Phoenix House, received the principal benefit of the relationship, since successful participation in the treatment program permitted dismissal of the criminal charges pending against him, and (3) that his work assignments were related exclusively to the operations of the treatment facility. *Id.* at *8. Having dismissed Vaughn's federal law claims, the Court declined to retain supplemental jurisdiction over Vaughn's claims under state and city law. *Id.* at *9.

The Court granted Vaughn leave to amend, and on October 27, 2015, Vaughn filed his Second Amended Complaint, which re-asserted his § 1983, FLSA, and state and city law claims, and brought an additional cause of action under 42 U.S.C. § 1994, the federal anti-peonage statute. Phoenix House again moved to dismiss, and on August 9, 2016, the Court granted Phoenix House's motion. *Vaughn v. Phoenix House Programs of New York*, 14-cv-3918, 2016 WL 4223748

3

(S.D.N.Y. Aug. 9, 2016). The Court held that Vaughn had failed to state claims under §§ 1983 and 1994, and that, as to his FLSA claims, Vaughn had once more failed to allege that he was a covered employee under the FLSA. Vaughn's Second Amended Complaint, the Court explained, failed to provide any additional factual allegations concerning his relationship to Phoenix House that would permit the Court to draw the inference that Vaughn was an "employee." Thus, "[f]or the reasons stated in its prior opinion," the Court again dismissed Vaughn's FLSA claims, noting that "the principal benefit of [Vaughn's] participation in the program was to him," and that Vaughn had agreed to participate in the treatment program not "for the purpose of receiving monetary compensation," but rather "to resolve the criminal charges against him." *Id.* at *4 (internal quotation marks omitted). The Court declined to exercise supplemental jurisdiction over Vaughn's state and city law claims, and denied him leave to amend. *Id.* at *5.

Vaughn appealed the dismissal of his Second Amended Complaint. The Second Circuit, in a summary order, affirmed the dismissal of Vaughn's claims under §§ 1983 and 1994, but remanded for reconsideration of the FLSA and state and city law claims. *Vaughn v. Phoenix House New York Inc.*, 722 F. App'x 4 (2d Cir. 2018). The Second Circuit explained that the FLSA claims required further analysis in light of *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016), characterizing that case as "an important precedent that may bear on [the] question" of whether Vaughn was an employee under the FLSA. 722 F. App'x at 6. Although the Second Circuit noted that *Glatt* addressed the specific question of whether *interns* are employees under the FLSA, it explained that "the nature of that relationship may have some resemblance to the vocational training aspects of certain rehabilitation programs[.]" *Id.* The Second Circuit thus vacated the Court's dismissal of the FLSA claims and remanded for further consideration. *Id.* at 6–7. It recommended that, on remand, Vaughn be appointed pro bono counsel. *Id.* at 7.

4

On remand, the Court appointed Vaughn pro bono counsel and granted him leave to amend.[2] On April 30, 2018, Vaughn filed the TAC, which alleges violations of the minimum wage and overtime provisions of the FLSA and the NYLL. Phoenix House once again moved to dismiss, principally on the ground that the TAC fails to plausibly allege that Vaughn qualifies as an employee under the FLSA.[3]

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Where the complaint "do[es] not permit the court to infer more than the mere possibility of misconduct," it does not "plausibly give rise to an entitlement to relief." *Id.*

## DISCUSSION

Consistent with the Second Circuit's remand, the Court has considered *Glatt* and the guidance that case provides regarding what qualifies as an employment relationship for the purposes of the FLSA. Although the Court remains of the view that the facts of this case are more analogous to the prison context, *see Danneskjold v. Hausrath*, 82 F.3d 37 (2d Cir. 1996), or to court-mandated community service, *see Doyle v. City of New York*, 91 F. Supp. 3d 480 (S.D.N.Y.

---

[2] The Court expresses its gratitude to pro bono counsel on both sides for their outstanding advocacy.
[3] Phoenix House also argues that Vaughn's FLSA claims are time-barred, as is the addition of Phoenix House Foundation as a defendant. Because the Court grants Phoenix House's motion on other grounds, the Court need not consider these alternative arguments.

5

2015), than they are to the internship context, *see Vaughn*, 2015 WL 5671902, at *7–8 (drawing on the analyses of *Doyle* and *Danneskjold* to conclude that Vaughn is not a FLSA employee), applying the *Glatt* framework here reinforces the Court's prior conclusion that Vaughn cannot plausibly have been Phoenix House's employee. Vaughn's FLSA claims are therefore dismissed. And for the reasons stated in its previous opinions, the Court again declines to exercise supplemental jurisdiction over Vaughn's claims under the NYLL.

**I.** ***Glatt***

In *Glatt*, the Second Circuit considered the question of whether an unpaid intern qualifies as an employee entitled to compensation under the FLSA. 811 F.3d at 535. The Court held that, in assessing the nature of the relationship between an intern and his employer, "the proper question is whether the intern or the employer is the primary beneficiary of the relationship." *Id.* at 536. This "primary beneficiary test," the Court explained, has "three salient features:" (1) its "focus[] on what the intern receives in exchange for his work," (2) its "flexibility to examine the economic reality" of the relationship, and (3) its acknowledgement that the intern-employer relationship is subject to unique considerations in light of the intern's expected "educational or vocational benefits that are not necessarily expected with all forms of employment." *Id.*

The Second Circuit has advised courts, "[i]n the context of unpaid internships," to weigh a "non-exhaustive set of considerations" when evaluating whether an unpaid intern qualifies as an employee for the purposes of the FLSA. *Id.* at 537. These considerations include:

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

6

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Id.* The *Glatt* Court explained that "every factor need not point in the same direction for the court to conclude that the intern is not an employee entitled to the minimum wage." *Id.* Rather, applying these factors "requires weighing and balancing all of the circumstances," with the "economic reality of the relationship" as the "touchstone of [the] analysis." *Id.*

## II. Applicability of *Glatt*

As a preliminary matter, the Court notes that although a high-level application of the "primary beneficiary test" is instructive for determining whether a patient in a drug treatment program can also qualify as the treatment center's employee, some of the specific factors enumerated in *Glatt* have limited application to the context at issue here. In *Glatt* itself, the Second Circuit expressly cabined its analysis to internships, remarking that the approach "is confined to internships and does not apply to training programs in other contexts." *Id.* In so doing, the Second Circuit emphasized that—unlike in other training programs—the "purpose of a bona-fide internship is to integrate classroom learning with practical skill development in a real-world

7

setting." *Id.* In light of this unique purpose, the Court explained, the *Glatt* factors focus on the "relationship between the internship and the intern's formal education." *Id.*

Last week, in *Velarde v. GW GJ, Inc.*, No. 17-330, 2019 WL 436869, at *1 (Feb. 5, 2019), the Second Circuit held that the primary beneficiary test also "governs in the for-profit vocational training context." The Court explained that the *Glatt* test is "equally suitable" to for-profit vocational training, because "[l]ike interns, vocational students enter a course of study with 'the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment.'" *Id.* at *4 (quoting *Glatt*, 811 F.3d at 536). In light of these expectations, the Court explained, "[t]he primary beneficiary test allows courts to measure the extent to which the school meets these expectations against the economic benefits received by the school in the form of free labor." *Id.* at *4. The Court made clear, however, that when applying the *Glatt* factors to new contexts, some factors "provide insight" while others may be "less telling." *Id.* at *5.

Vaughn's purposes in participating in Phoenix House's treatment program were, unlike in the internship or vocational training context, to avoid facing criminal charges and obtain treatment for substance abuse. TAC at ¶¶ 1, 22. These goals are fundamentally different from the goals that motivate participation in an unpaid internship or vocational training program. Accordingly, the *Glatt* factors that focus on the relationship between an unpaid internship and the intern's formal education program—for example, the existence of integrated coursework, the receipt of academic credit, and the extent to which the internship accommodates the academic calendar—have no direct application here. *See Glatt*, 811 F.3d at 537 (factors two through four). Moreover, to the extent that these factors call to mind analogous considerations that bear on whether Vaughn was Phoenix House's employee, the *Glatt* analysis assigns them more weight than is due. In particular,

8

devoting three of seven factors to the relationship between a program and its participant's formal education makes sense where the very purpose of that program is to "integrate classroom learning with practical skill development." *Id.* But where, as here, that purpose is absent, placing such emphasis on a program's links to education obscures the "economic reality of the relationship," which is, again, the "touchstone of the analysis." *Id.*

The Court thus believes that a stringent application of the *Glatt* factors to this case would "cause [the] [C]ourt to miss the forest for the trees." *Doyle*, 91 F. Supp. 3d at 486. It would place too much importance on the rehabilitation program's links to education and too little importance on the central purposes underlying this relationship, namely, Vaughn's desire to avoid criminal charges and obtain treatment for substance abuse. Thus, although the Court applies the primary beneficiary test to evaluate whether Vaughn qualifies as an employee, in weighing the *Glatt* factors the Court focuses on a "higher level of generality" in order to faithfully assess the "economic reality" of Vaughn's relationship with Phoenix House. *Danneskjold*, 82 F.3d at 42.

### III. Application of *Glatt*

As stated above, the central inquiry endorsed by *Glatt* is whether the employer or the intern—here, the patient—was the "primary beneficiary" of the relationship. An examination of the *Glatt* factors—and the relative weights of those factors in this context—makes plain that it was Vaughn, not Phoenix House, who primarily benefitted from Vaughn's participation in the substance abuse treatment program.

#### A. Factors One and Seven: Expectation of Compensation or Paid Job

Factors one and seven require the Court to consider the extent to which the parties understood that there was no expectation of compensation or entitlement to a paid job. These factors have been consistently described as critical to determining whether an individual is an employee for the purposes of the FLSA, not only in the internship context, but in various other

9

contexts as well. For example, in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), which involved a training program for prospective brakemen, the Supreme Court underscored that the FLSA "was obviously not intended to stamp all persons as employees who, *without any express or implied compensation agreement,* might work for their own advantage on the premises of another." *Id.* at 152 (emphasis added). Relying in large part on the absence of any such compensation agreement between the parties, the *Walling* Court held that the FLSA did not cover the trainees in that case. *Id.* The Ninth Circuit, likewise, in concluding that a participant in the Salvation Army's rehabilitation program was not covered under the FLSA, relied in substantial part on the fact that the participant "had neither an express nor an implied agreement for compensation with the Salvation Army and thus was not an employee." *Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996). In *Glatt*, too, the Second Circuit emphasized that "[a]ny promise of compensation, express or implied, suggests that the intern is an employee—and vice versa." 811 F.3d at 537; *see also Wang v. Hearst Corp.*, 877 F.3d 69, 73 (2d Cir. 2017) ("[F]actors [one and seven] are crucial to understanding the 'economic reality' of the internship relationship.").

As in *Walling* and *Williams*, factors one and seven point decidedly against concluding that Vaughn was Phoenix House's employee. Vaughn concedes as much. Pl's. Opp. at 10 n.5 ("Plaintiff has not addressed the first or seventh *Glatt* factors because he does not allege that Phoenix House promised him a job or compensation in exchange for his work."). The TAC contains no allegations that the parties expected Vaughn to receive compensation for his work at Phoenix House's facilities, or that Vaughn believed he would be entitled to a paid job at the conclusion of his treatment. To the contrary, Vaughn alleges that "[t]he purpose of Vaughn's diversion to Phoenix House was to receive treatment" and that he "hoped that his time at Phoenix

House would provide him with the therapy he needed to lead a drug-free life and allow him to be a good parent to his young daughter." TAC at ¶¶ 21–22. Moreover, although the TAC contains few details concerning the relationship between Vaughn's criminal charges and his participation in treatment, it is clear that he agreed to attend rehabilitation "in lieu of facing criminal charges," and that his alternative was to go to jail. *Id.* at ¶¶ 1, 36–37.

These allegations weigh heavily in favor of a finding that Vaughn's relationship with Phoenix House was not one of employment. Vaughn does not allege that he participated in substance abuse treatment "for the purpose of enabling [him] to earn a living." *Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (holding that an individual civilly committed to a treatment facility as a sexually violent person was not covered by the FLSA); *Doyle*, 91 F. Supp. 3d at 487 ("Put simply, people who perform community service as a condition of an [adjournment in contemplation of dismissal ("ACD")] do not do so 'for the purpose of enabling them to earn a living,' or indeed to receive financial compensation of any kind.") (internal citation omitted). Nor does he allege that his work was performed "in exchange for in-kind benefits." *Williams*, 87 F.3d at 1067. Rather, the purpose of his relationship with Phoenix House was "solely rehabilitative and at no point was there an express or implied agreement for compensation." *Id.* at 1068. Factors one and seven, accordingly, strongly suggest that Vaughn "was never an 'employee' and thus [that] the FLSA does not apply." *Id.*

### B. Factor Five: Limited Duration

Factor five, which asks whether "the internship's duration is limited to the period in which the internship provides the intern with beneficial learning," 811 F.3d at 537, similarly counsels against a finding that Vaughn was Phoenix House's employee. Vaughn alleges that he agreed to enter the treatment program for a limited period of 18–24 months, that he was released after approximately 15 months, and that he was sent back to the facility only after he violated the

11

conditions of his outpatient treatment. TAC at ¶¶ 9, 40, 42. These allegations indicate that the duration of Vaughn's participation in the program was tailored to his individual treatment needs and limited to the period in which the program could be expected to provide Vaughn with rehabilitative benefits. *See Williams*, 87 F.3d at 1068 ("[T]he beneficiaries of the Salvation Army remain in the work-therapy program long enough to overcome their substance abuse problems and gain the necessary work-related skills to reenter the marketplace."). Although the duration of his stay at Phoenix House's treatment facility was lengthy, it was so in part because Vaughn violated the conditions of his outpatient treatment, suggesting that he still stood to benefit from the in-patient program. *Id.* at ¶ 42. The duration of Vaughn's participation in the program was thus limited to the period in which it provided him with beneficial treatment, indicating that it was structured to benefit Vaughn, not Phoenix House. Accordingly, this factor, like factors one and seven, points against finding that Vaughn was Phoenix House's employee.

### C. Factor Six: Displacement of the Work of Paid Employees

By contrast, the sixth factor, which asks whether "the intern's work complements, rather than displaces, the work of paid employees," 811 F.3d at 537, could plausibly support a finding that Vaughn was Phoenix House's employee. This factor—like factors one, seven, and five—has been applied to settings beyond the internship context to evaluate whether workers are employees under the FLSA. For example, in *Walling*, the Supreme Court noted that the trainees at issue in that case "[did] not displace any of the regular employees, who [did] most of the work themselves, and [had to] stand immediately by to supervise whatever the trainees [did]." 330 U.S. at 150. Similarly, the Second Circuit, in *Velarde*, reasoned that because the plaintiff in that case—a vocational student who performed unpaid work at a salon—conducted his work "under the watchful eye of its industry experienced educators," the fact that he was "otherwise useful or

12

productive to the [vocational school] did not render him its employee." 2019 WL 436869, at *7 (internal quotation marks omitted).

Here, the TAC's allegations, construed in the light most favorable to Vaughn, allow the Court to reasonably infer that some of Vaughn's work displaced, rather than complemented, the work of paid employees. Vaughn alleges that he worked eight hour shifts, six days a week, in the garbage room, at the warehouse, and as the "basement point." TAC at ¶¶ 30, 32, 34, 46–47. He further alleges that some of this work was completed alone and unsupervised. *Id.* at ¶¶ 31, 33. The nature of this work, and the number of hours he spent performing it, suggest that Vaughn was engaged in work that may otherwise have been completed by paid staff. This factor supports a finding that Vaughn was plausibly Phoenix House's employee.

### D. Factors Two, Three, and Four: Similarities and Links to Formal Education

As stated previously, factors two, three, and four—which assess whether an internship program is similar to an educational environment, whether it is tied to an intern's formal education program, and whether it accommodates an intern's academic commitments—are not directly relevant to Vaughn's relationship with Phoenix House, because Vaughn did not participate in any formal education program while receiving in-patient treatment. These factors also do not weigh as heavily as they do in the internship context, given that the purpose of Vaughn's treatment was not, as in the case of the unpaid internship, to "integrate classroom learning with practical skill development in a real-world setting," *Glatt*, 811 F.3d at 537, but rather to address a substance abuse problem and avoid prison. Nevertheless, factors two, three, and four raise arguably analogous considerations, which may shed some light on the nature of the relationship at issue in this case.

13

For example, as to factor two—the extent to which the internship provides training similar to that which would be provided in an educational environment—it is helpful to consider whether Vaughn's work environment was similar to an educational setting, or instead resembled the stricter structures of an employment relationship. Vaughn's allegations to that effect cut both ways. On the one hand, Vaughn alleges that the menial work he was asked to complete was exhausting and stressful, did not advance his treatment goals, and at times interfered with his ability to participate in therapeutic sessions. TAC at ¶¶ 28, 35. Vaughn also alleges that he conducted some of his work alone and unsupervised, which tends to suggest that the environment was focused on work, rather than on vocation or rehabilitation. On the other hand, Vaughn's job responsibilities—working as the point person for his floor, preparing food, and working in the garbage room—all tend to serve the rehabilitative purposes of acquiring skills for daily living, "eas[ing] [his] transition to the world outside," and "equip[ping] [him] with skills and habits that will make [him] less likely to return to crime." *Sanders*, 544 F.3d at 814. The work he was asked to complete was not on behalf of any "private, for-profit enterprise[]," and was not directed toward the "produc[tion] of goods or services that are sold in commerce." *Doyle*, 91 F. Supp. 3d at 490 (quoting *Danneskjold*, 82 F.3d at 44). Moreover, Phoenix House did not fire Vaughn when he repeatedly refused to report to work; rather, it warned him that work was a required aspect of his program, arranged an "intervention" with a counselor, and sought the input of a judge. *Id.* at ¶ 39. These allegations suggest that the treatment facility had more in common with an educational environment than an employment setting. Factor two, accordingly, could support either a finding that Vaughn was Phoenix House's employee or a finding that he was not.

Like factor two, factors three and four also seem to cut both ways. As to factor three—"[t]he extent to which the internship is tied to the intern's formal education program by integrated

14

coursework or the receipt of academic credit," 811 F.3d at 537—Vaughn's work was tied to his treatment program and he received a form of "credit" by avoiding his criminal charges. On the other hand, Vaughn alleges that no one explained to him how his work advanced his rehabilitation goals, suggesting that the work was not "integrated" with his treatment plan. TAC at ¶ 51. As to factor four—"[t]he extent to which the internship accommodates the intern's academic commitments," *id.*—Vaughn alleges that the program at times accommodated his therapeutic and vocational goals, but at times did not. For instance, at one point during his treatment, Vaughn was able to spend large portions of the day taking vocational classes in basic carpentry. TAC at ¶ 35. On the other hand, Vaughn's work purportedly interfered with his rehabilitation by exhausting him and causing him to miss out on therapeutic sessions. *Id.* at ¶ 2. These latter allegations suggest that Phoenix House did not accommodate Vaughn's therapy the way an employer of an unpaid intern might accommodate the intern's academic commitments. Factors three and four, like factor two, could therefore support either a finding that Vaughn was Phoenix House's employee or a finding that he was not.

### E. Weighing the *Glatt* Factors

In sum, factors one, seven, and five weigh strongly against finding that Vaughn was Phoenix House's employee. Factor six points in favor of finding that Vaughn was Phoenix House's employee. And factors two, three, and four provide mixed guidance. Critically, however, weighing these factors in light of "all of the circumstances" alleged in the TAC makes clear that Vaughn was the "primary beneficiary" of this relationship and was not, in any plausible sense, an employee of Phoenix House's treatment program. *Glatt*, 811 F.3d at 537.

Vaughn's participation in Phoenix House's rehabilitation program afforded him significant benefits, some of which are captured by the *Glatt* factors and others which are not. Most importantly, Vaughn was given the opportunity to avoid facing his criminal charges and to stay

15

out of prison. He was provided with food, a place to live, therapy, vocational training, and jobs that kept him busy and off drugs. Although Vaughn may have preferred to acquire "skills that could translate into stable (i.e., not menial, low wage) employment," TAC at ¶ 52, the jobs he was assigned undoubtedly furthered the development of the skill of self-sufficiency, which could be expected to facilitate his transition to a drug-free life. *Cf.* 14 N.Y.C.R.R. § 819.2(d)(3) ("A chemical dependence residential service shall have as [one of] its goals . . . the utilization of individualized treatment/service plans to support the maintenance of recovery and the attainment of self-sufficiency, including, where appropriate, the ability to be functionally employed[.]"); *Danneskjold*, 82 F.3d at 43 ("Prisoners may thus be ordered to cook, staff the library, perform janitorial services, [or] work in the laundry . . . Such work occupies prisoners' time that might otherwise be filled by mischief [and] it trains prisoners in the discipline and skills of work[.]").

Phoenix House, on the other hand, received no comparable benefit from taking on Vaughn as a patient at its facilities. It is true, as discussed in the Court's analysis of the sixth *Glatt* factor, that Vaughn performed work that Phoenix House might otherwise have been required to hire a paid employee to perform. In that sense, as Vaughn alleges, Vaughn's work may have enabled Phoenix House "to reduce its costs in comparison to other treatment facilities in the marketplace." *Id.* at ¶ 61. However, particularly in light of the fact that Vaughn did not work "to produce goods or services that are sold in commerce," *Danneskjold*, 82 F.3d at 43, but rather to "serve various institutional missions of the [facility], such as . . . care and maintenance," *id.*, any such benefit does not meaningfully compare to the substantial benefits Vaughn received from participating in Phoenix House's treatment program. When courts have considered this issue under comparable circumstances, they have not considered the displacement of paid employees to be dispositive, or even material. *See Williams*, 87 F.3d at 1068 (holding that participants in the Salvation Army's

16

rehabilitation program were not employees under the FLSA, without considering whether their work displaced the work of FLSA employees); *Doyle*, 91 F. Supp. 3d at 490 (holding that individuals who performed community service as a condition of an ACD were not FLSA employees, and rejecting the argument that "allowing the City to exploit their free labor undermines the FLSA wage scale because the City would otherwise have to hire people to do their work.").

Furthermore, in evaluating the importance of the sixth *Glatt* factor in light of the totality of the circumstances of this case, it is important to recognize, for the reasons stated above, that this context differs significantly from the internship and for-profit vocational training contexts. In contrast to Phoenix House's treatment facilities, which operate for the exclusive purpose of "providing drug and alcohol addiction treatment," TAC at ¶ 14, places of employment that hire interns or vocational trainees most often operate for some purpose other than to provide training to their unpaid interns. The interns and trainees that work at such places of employment perform work, which, in addition to providing them with educational and vocational benefits, also advances the employer's purposes apart from intern/trainee development. Because the work of interns and trainees provides these entangled benefits to both intern and employer, "teasing out the respective benefits garnered by students and their commercial training programs is key to determining whether, for FLSA purposes, a trainee is serving *primarily* as an employee of that school or training program—or is *primarily* a student." *Velarde*, 2019 WL 436869, at *4.

The same dynamic does not exist in the in-patient drug rehabilitation context described by Vaughn in the TAC. Unlike the work of an unpaid intern or trainee, all of Vaughn's work at Phoenix House contributed to the mission of "providing drug and alcohol addiction treatment" to patients like Vaughn. His work facilitated the day-to-day operations of his residence and provided

17

him with the opportunity to develop skills of vocation and self-sufficiency—even if they were not the skills that Vaughn himself would have independently chosen to develop. In that sense, his work was more akin to court-mandated community service, *see Doyle*, 91 F. Supp. 3d at 487, or prison labor, *see Danneskjold*, 82 F.3d at 44, than it was to the work of an unpaid intern. The Court thus places less weight on the sixth *Glatt* factor here than it might in the case of an unpaid internship, or in another employment context in which the employer stands to gain something from the relationship beyond maintaining the very facility whose sole purpose it is to serve the purported employees.

For similar reasons, the Court places less weight on Vaughn's allegations relevant to *Glatt* factors two, three, and four—that his work was often unsupervised and exhausting, and that it at times interfered with his ability to attend therapeutic sessions, thereby adversely affecting his efforts to obtain "the therapy he needed to lead a drug-free life." TAC at ¶ 22. These allegations, accepted as true, paint a potentially problematic picture of the treatment Vaughn received at Phoenix House. But "[t]hat [Phoenix House did] not provide the *optimal* learning experience for [Vaughn] does not necessarily transform it into the primary beneficiary of the relationship." *Velarde*, 2019 WL 436839, at *6. Even if Vaughn's work was exhausting and unsupervised, it still afforded him the significant benefits the Court has already described, while providing Phoenix House with no comparable benefits in return. For that reason, Vaughn's allegations that Phoenix House did not properly supervise or accommodate him do not plausibly suggest that Vaughn was Phoenix House's employee—they suggest, at most, that the treatment Vaughn received was unsatisfactory. Vaughn is, of course, entitled to complain to the appropriate regulatory authority about the nature and quality of his treatment; indeed, it appears from the TAC that he already has. TAC at ¶ 63. But as Vaughn was undoubtedly the primary beneficiary of his treatment at Phoenix

18

House's facilities, his allegations do not make out a plausible claim that Vaughn was Phoenix House's employee and thus entitled to wages under the FLSA.

## CONCLUSION

For the foregoing reasons, Vaughn's FLSA claims are dismissed. The Court declines to exercise supplemental jurisdiction over his claims under the NYLL. Accordingly, the Third Amended Complaint is dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 100 and to close this case.

SO ORDERED.

Dated: February 12, 2019
New York, New York

Ronnie Abrams
United States District Judge